# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DIANA LYNN GRANDEL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | No. 13 C 1231 <br><br> Magistrate Judge Finnegan |

## ORDER

Plaintiff Diana Lynn Grandel seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion and remands the case for further proceedings.

## BACKGROUND

Plaintiff's last day of full-time work was March 8, 2009. (R. 77; 496; 518). She had been working since 2004 as a telemarketer selling insurance, but was let go. (*Id.*). She previously worked as a clerk in car dealerships and a sales clerk selling nutritional supplements, but was either fired from or quit those jobs due to mental breakdowns, anxiety attacks, paranoia or seizures at work. (R. 68; 77; 496; 518). Plaintiff reported living alone; after several suicide attempts, a court found her mentally unfit to care for her daughter (who was being raised by Plaintiff's brother and sister-in-law). (R. 41; 51).

Plaintiff filed her initial application for DIB on October 1, 2009, alleging disability beginning March 8, 2009. (R. 19; 101). After the Social Security Administration denied Plaintiff's claim initially and upon reconsideration, Administrative Law Judge ("ALJ") Janice M. Bruning held a June 13, 2011 hearing, attended by Plaintiff and her attorney. (R. 73; 108-118; 137-140; 144-146). In the ALJ's subsequent August 3, 2011 decision, she determined that Plaintiff's last date insured for DIB purposes was June 30, 2011, and that Plaintiff was not disabled on or before that date. (R. 108-118). On April 19, 2012, the Appeals Counsel remanded Plaintiff's case back to the ALJ for reconsideration, in part because it found her date last insured is December 31, 2014 (not June 30, 2011). (R. 128-133). The Appeals Counsel also required the ALJ to reconsider the severity of Plaintiff's combined impairments, stating it was "not convinced" that the limitations the ALJ found were "an accurate reflection of [Plaintiff's] level of functioning." (R. 130-31). The ALJ then held a second hearing on October 3, 2012, at which Plaintiff (who was represented by counsel), a medical expert, and a vocational expert testified. (R. 37-72).

In the ALJ's decision dated November 26, 2012, she found Plaintiff suffered from the following severe impairments: seizure disorder with postictal headaches, major depressive disorder (recurrent), generalized anxiety disorder, borderline personality disorder, and alcohol abuse disorder. (R. 22). The ALJ rejected the opinions of Plaintiff's treating psychiatrist and therapist that her impairments made her unable to function in a full-time job. (R. 26). Instead, the ALJ found Plaintiff capable of unskilled work with certain workplace limitations, including no public contact and only occasional contact with co-workers and supervisors. (R. 27-28). Therefore, the ALJ concluded

that Plaintiff was not disabled from March 8, 2009 through the date of her November 26, 2012 decision. (R. 28). On December 4, 2012, Plaintiff requested that the Appeals Counsel review the ALJ's second decision, but the Appeals Counsel denied Plaintiff's request on January 31, 2013. (R. 1-5; 14).

Plaintiff now seeks judicial review of the ALJ's November 26, 2012 decision, which stands as the final decision of the Commissioner. In support of her motion, Plaintiff argues that: (1) the ALJ erred in rejecting the opinions of her treating psychiatrist and therapist that she cannot work full-time; (2) the ALJ failed to account for limitations caused by Plaintiff's seizure disorder with postictal headaches, severe mental impairments, and moderate difficulties maintaining concentration, persistence and pace, resulting in a flawed RFC; and, (3) the flawed RFC led to incomplete hypothetical questions to the VE, compromising the vocational testimony.

## DISCUSSION

### A. Standard of Review

The ALJ's decision will be upheld "so long as it is supported by 'substantial evidence' and the ALJ built an 'accurate and logical bridge' between the evidence and her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (quoting *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). An ALJ need not mention every piece of evidence in her opinion, as long as she does not ignore an entire line of evidence that is contrary to her conclusion. *Id.* (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). Although the Court will not reweigh the evidence or substitute its judgment for that of the ALJ, a decision that "lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014) (citations omitted).

## B. Opinion of Therapist Kathleen Daly

Plaintiff challenges the ALJ's rejection of therapist Kathleen Daly's April 22, 2011 opinion that Plaintiff could not work full-time, as set forth in her "Report by Case Manager or Therapist." (Doc. 12, at 12-13; Doc. 21, at 1-4). Plaintiff admits that the ALJ appropriately found Ms. Daly, a therapist, is not an "acceptable medical source" under the regulations, but rather is an "other medical source" whose opinion is not entitled to "controlling weight." (*Id.*). *See also Phillips v. Astrue,* 413 F. App'x 878, 884 (7th Cir. 2010) ("other medical sources" cannot be characterized as "treating sources," and their findings cannot "establish the existence of a medically determinable impairment") (quoting SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006)).

Nevertheless, Plaintiff argues the ALJ erred by failing to determine the weight of Ms. Daly's opinion by considering the applicable factors in the regulations for evaluating other medical sources. (Doc. 12, at 12-13; Doc. 21, at 3-4). *See also Philips*, 413 F. App'x at 884 (in deciding how much weight to give the opinions from other medical sources, the ALJ should apply the same criteria listed in 20 C.F.R. § 404.1527 for evaluating medical opinions from acceptable medical sources). These factors include "the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue,* 647 F.3d 734 (quoting *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009)). The ALJ explained that she rejected Ms. Daly's assessment because: her report was written over five months after the last time Ms. Daly treated Plaintiff; Plaintiff appeared to be seeking "medication management"

4

rather than counseling; and Ms. Daly's report appeared to merely recite Plaintiff's own assessment of her symptoms. (R. 26).

The record supports the ALJ's explanation and conclusions regarding her consideration of this evidence. Ms. Daly's report explicitly states that the therapist last saw Plaintiff on November 8, 2010, but then wrote the report over five months later, on April 22, 2011. (R. 1098-99). Ms. Daly also wrote in her report that Plaintiff did not "seek out treatment for counseling" but rather sought "case management for benefits" and "medication." (R. 1098-99.). Ms. Daly's treatment notes also indicate that several meetings between her and Plaintiff were spent getting Plaintiff help with obtaining low-cost medications, rather than on counseling. (R. 955-64; 980-82).

Ms. Daly did write some notes reflecting that Plaintiff called the therapist to seek advice, and other notes appear to reflect some in-person counseling sessions. (R. 955-64; 980-82). The notes from those sessions tend to briefly describe Plaintiff's complaints—such as anxiety and mood problems or issues with interpersonal relationships—and then indicate that Ms. Daly prescribed relaxation techniques and other practices to help Plaintiff. (*Id.*). The notes usually state that Ms. Daly encouraged Plaintiff to take her medications, and whether Plaintiff "responded" to the therapist's encouragement or suggestions (without explaining what that means). (*Id.*). Ms. Daly's notes that discuss counseling sessions do not contain the therapist's observations or assessments of Plaintiff's symptoms or their severity. They instead mainly contain Plaintiff's descriptions of her complaints, as the ALJ's opinion states.

Plaintiff argues that Ms. Daly's opinion was well-supported because it was based on her clinical observations and from analyzing the notes of her treating psychiatrist, Dr.

5

Kurdikar, who treated Plaintiff at the same facility as Ms. Daly. (Doc. 12, at 13; Doc. 21, at 3-4). However, there is no indication in either Ms. Daly's notes or her report that she relied on either her own or Dr. Kurdikar's observations, and Plaintiff cites no evidence from the record in support of her argument. Instead, the ALJ's assessment of Ms. Daly's opinion is grounded in an analysis of Ms. Daly's notes and report, supported by substantial evidence in the record, and is not grounds for reversal.[1]

## C.  Opinion of Treating Psychiatrist Dr. Vibha Kurdikar

Plaintiff also argues that the ALJ erred in rejecting the May 13, 2011 opinion of her treating psychiatrist, Dr. Kurdikar. (Doc. 12, at 10-12; Doc. 21, at 1-3). Dr. Kurdikar's opinion is set forth in her "Mental Disorders Report," dated May 13, 2011, which states that Plaintiff: suffered from decreased energy, anxiety and moodiness; exhibited distrustfulness and "inappropriate" behavior when interacting with others; and that her anxiety sometimes prevented her from leaving home. (R. 1112-15). The psychiatrist also assessed Plaintiff with poor responses to stress; poor judgment and insight; moderate restrictions in her activities of daily living and in social functioning; and marked difficulties in maintaining concentration, persistence or pace. (*Id.*). Overall, Dr.

---

[1] On January 18, 2013, Plaintiff submitted a brief to the Appeals Counsel in support of her request for review of the ALJ's November 26, 2012 decision, which included a January 16, 2013 letter signed by Ms. Daly and Dr. Kurdikar. (R. 530-38; 1677-78). Plaintiff argues that this Court must consider the letter when determining whether the ALJ's decision to reject Ms. Daly's and Dr. Kurdikar's opinions was supported by substantial evidence. (Doc. 21, at 1). But, as the Commissioner correctly argues, this Court cannot consider the letter because it was never before the ALJ; the supportability of the ALJ's decision depends only on the evidence that was before her. (Doc. 19, at 10). *See also Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004) ("[W]e note that it is not appropriate for us to consider evidence which was not before the ALJ, but which [the claimant] later submitted to the Appeals Council (or any argument based upon such evidence). . . . Although technically a part of the administrative record, the additional evidence submitted to the Appeals Council . . . cannot now be used as a basis for a finding of reversible error.") (internal citations omitted).

6

Kurdikar found that Plaintiff's prognosis was fair, and she was unable to function in a competitive work setting on a full-time basis. (R. 1113).

"Under the 'treating physician rule,' a treating physician's opinion that is consistent with the record is generally entitled to 'controlling weight.'" *Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 911 (7th Cir. 2011)). If the ALJ finds the opinion is not due controlling weight, she must minimally articulate the reasons why. *Id.* (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). The ALJ summarized a portion of Dr. Kurdikar's treatment notes (those from June 20, 2011 through August 7, 2012) before analyzing the psychiatrist's report. (R. 25). In pertinent part, the ALJ wrote that Plaintiff complained of trouble sleeping, anxiety and symptoms of depression, but Dr. Kurdikar found Plaintiff was cognitively intact ,and that she showed improvements when her medications were increased or adjusted. (*Id.*). The ALJ noted that Plaintiff reported being well-enough to work a part-time job at her May 8, 2012 session, and some of her problems were attributable to non-compliance with her medication. (*Id.*). The ALJ then wrote that Dr. Kurdikar found (almost a year earlier) in her May 13, 2011 report that Plaintiff's symptoms were so severe as to preclude substantial gainful activity, but the ALJ rejected that opinion. (R. 26). Although the ALJ does not explicitly state this, it appears she found Dr. Kurdikar's opinion was not supported by the findings in her treatment notes.

Plaintiff argues that Dr. Kurdikar's opinion was in fact well-supported by and consistent with her notes, citing many of the psychiatrist's findings that are contrary to the ALJ's conclusion and that the ALJ did not discuss. (Doc. 12, at 10-12; Doc. 21, at 1-

7

3). Plaintiff further argues that the ALJ's other reason for rejecting Dr. Kurdikar's opinion—that Plaintiff missed several appointments—is not a "good reason" for rejecting the treating psychiatrist's opinion. (*Id.*). As a result, the ALJ failed to provide a sound explanation for rejecting Dr. Kurdikar's opinion. (*Id.*). This Court agrees that the ALJ failed to sufficiently articulate why she gave no weight to Dr. Kurdikar's opinion.

Plaintiff began seeing Dr. Kurdikar on April 26, 2010, and complained of struggling with depression, anxiety, feelings of helplessness, a seizure disorder, and chronic insomnia. (R. 846). Dr. Kurdikar found Plaintiff's memory, concentration and other cognitive processes were intact. (R. 847-48). But the psychiatrist also observed that Plaintiff was dressed inappropriately, displayed poor hygiene, psychomotor restlessness, abnormally spontaneous speech, and was anxious and irritable. (R. 847-48). Dr. Kurdikar rated Plaintiff's Global Assessment of Functioning ("GAF") score at 40.[2] (*Id.*). At sessions throughout 2010, Plaintiff's conditions, and Dr. Kurdikar's observations and assessments, remained fairly constant. Although Plaintiff reported occasional improvements in certain symptoms due to adjustments in her medications, she continued to report issues with panic attacks, anxiety, mood swings, depression, irritability, problems with interpersonal relationships, trouble sleeping, stress headaches, and emotional outbursts. (R. 931-47; 1051-68). Dr. Kurdikar noted improvements over time in Plaintiff's restless motor activity, but also added to her reports that Plaintiff showed signs of impulsivity, poor insight, and impaired judgment. (*Id.*). Dr. Kurdikar

---

[2] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id.*

8

also consistently rated Plaintiff's GAF score at 40 throughout 2010. (*Id.*). Regarding Plaintiff's treatment from Dr. Kurdikar in 2010, the ALJ only wrote that Plaintiff missed several appointments, and discussed none of the psychiatrist's findings.

In Dr. Kurdikar's notes regarding a January 18, 2011 treatment session, the psychiatrist noted that Plaintiff cancelled two previous appointments due to vacationing with friends, and that Plaintiff reported enjoying the vacation. (R. 1080). But the notes also reflect that Plaintiff continued to report issues with anxiety, trouble sleeping, and symptoms of depression, including being unmotivated and having trouble getting out of bed for several weeks. (R. 1080). Dr. Kurdikar's clinical observations remained the same as they were in 2010, and she continued to rate Plaintiff's GAF score at 40. (R. 1081-1090). At appointments in March, April, May and June 2011, Plaintiff reported occasional non-compliance with her medications due to cost issues, but otherwise her complaints, and Dr. Kurdikar's observations, remained fairly consistent. (R. 1081-97; 1446-50).

At Plaintiff's August 15, 2011 session, she reported a suicide attempt after finding out she was denied benefits and thinking she would have to remain living with an abusive ex-boyfriend, and she was hospitalized. (R. 1452). Dr. Kurdikar observed Plaintiff's speech was no longer abnormal, but her affect was constricted and she appeared depressed, intensely tearful, mildly defensive, and irritable. (R. 1453). Upon examination, the psychiatrist found that although Plaintiff's concentration, memory and attention remained intact, she was not oriented to situation, had low motivation, and her GAF score was 45.[3] (R. 1453-55). At sessions in October and December 2011,

---

[3] A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or

Plaintiff continued to report problems sleeping, anxiety, depression and issues with motivation. (R. 1457-66). She reported going off some medications due to lost funding, but then reported going back on them once the funding was returned. (*Id.*). Dr. Kurdikar found Plaintiff displayed some hygiene improvements and a more stable affect, but also found her fund of knowledge and information was impaired, she was sometimes not oriented to person, situation or place, and her GAF score remained at 45. (*Id.*).

Regarding Dr. Kurdikar's 2011 treatment records, the ALJ acknowledged Plaintiff complained of depression and trouble sleeping, but otherwise emphasized that Plaintiff was non-compliant with her medications and that she had "intact" and "normal" thought processes. (R. 25). But the ALJ did not discuss Dr. Kurdikar's findings that conflicted with the ALJ's assessments, or Plaintiff's explanation that funding issues caused her to temporarily cease using certain medications. Notably, when recounting the appointment at which Plaintiff discussed her suicide attempt and hospitalization, the ALJ only wrote that Plaintiff "complained mostly of no more than having been denied disability benefits." (*Id.*).

Dr. Kurdikar's treatment notes from February through August 2012 continued with similar reports of Plaintiff's complaints and of the psychiatrist's findings as found in the 2011 notes. Plaintiff reported occasional, temporary improvements in certain symptoms with increased medication, and some help from attending prayer groups and trying relaxation techniques. (R. 1467-91). But she continued to report motivation problems, anxiety, sleep problems, panic attacks, mood swings, irritability, angry

---

school functioning (e.g., no friends, unable to keep a job). American Psychiatric Association, *supra* note 2, at 32-34.

outbursts, and "crashes into depression." (*Id.*). Dr. Kurdikar noted some instances when Plaintiff's hygiene was poor again, and occasions when her restless motor activity returned. (*Id.*). The psychiatrist also found Plaintiff's affect and mood were "up and down," noting she was anxious, depressed, tearful, and her affect was constricted, but sometimes noting less tearfulness or sadness. (*Id.*). Dr. Kurdikar generally found Plaintiff's orientation, attention, concentration and memory were intact, but she also found Plaintiff's judgment and insight were impaired, her motivation was low, she was sometimes "unstable," and her GAF score remained at 45. (*Id.*). Although on May 8, 2012, Plaintiff reported starting a part-time job at Chase Bank, by July 10, 2012, she had lost that job due to being sent home too many times for anxiety and panic attacks. (R. 1477; 1482).

When summarizing Dr. Kurdikar's 2012 notes, the ALJ wrote that Plaintiff expressed "anxiety," but otherwise acknowledged only the positive findings in those records. (R. 25). The ALJ discussed Plaintiff's improvements with medications, but not any subsequent reports of worsening symptoms. (*Id.*). And the ALJ noted Dr. Kurdikar's findings of Plaintiff's intact memory, concentration and attention, but did not discuss her findings of impaired judgment and insight, low motivation and energy, or other cognitive, mood or affect issues. (*Id.*). The ALJ also stressed that Plaintiff was "well enough to begin working part-time," but did not explain her consideration of the fact that Plaintiff reported being fired about two months after starting the job due to issues related to her impairments. (*Id.*).

The ALJ's summary of Dr. Kurdikar's notes does not sufficiently explain why she rejected Dr. Kurdikar's opinion based on the factors required in the regulations.

11

"Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)); *see also Thomas*, 745 F.3d at 806 (an ALJ cannot "ignore a line of evidence contrary to her conclusion") (citing *Arnett*, 676 F.3d at 592). The ALJ's opinion makes only a few, minor references to some of Plaintiff's complaints to Dr. Kurdikar, and provides no discussion of the psychiatrist's observations and examination findings that conflicted with the ALJ's decision. As a result, the ALJ falls short of giving the "good reasons" necessary for discounting the opinion of Plaintiff's treating psychologist. *See Moore*, 743 F.3d at 1127 (quoting *Scott*, 647 F3d at 739).

The Commissioner argues that the ALJ properly found that Dr. Kurdikar's opinion is not supported because her report did not contain her clinical findings, but they were instead reflected only in her treatment notes. (Doc. 19, at 6). The ALJ did not employ this rationale, and thus this Court shall disregard it. *See, e.g.*, *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) ("But the Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)). The Commissioner's argument also erroneously implies that the ALJ should not consider Dr. Kurdikar's treatment notes in determining the supportability and consistency of the psychiatrist's medical opinion, but this is exactly what the regulations require the ALJ to do. *See* 20 C.F.R. § 404.1527(c).

The Commissioner also notes that in Dr. Kurdikar's July 2010 report, the psychiatrist wrote that Plaintiff missed several appointments and that she did not have enough information to opine on Plaintiff's ability to work, implying that Plaintiff's later missed appointments also undermine Dr. Kurdikar's later report. (Doc. 19, at 6-7). But this argument, like the Commissioner's previous argument, also employs evidence and reasoning not used by the ALJ, and this Court disregards it. What the ALJ wrote about the missed appointments is that they reflect an inconsistent level of treatment seeking by Plaintiff, and that Plaintiff cancelled two appointments to have a holiday vacation that she enjoyed. (R. 26). Without more analysis by the ALJ, it is not possible to tell why she thought Plaintiff's missed appointments and holiday vacation undermined Dr. Kurdikar's opinion. *See Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (missing appointments can be a symptom of mental illness and can support an opinion that a claimant's limitations will cause absenteeism from work); *see also id.* at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.") (citations omitted).

Finally, the Commissioner argues that the ALJ properly rejected Dr. Kurdikar's opinion because it was inconsistent with the opinion of Dr. Kathleen M. O'Brien, the medical expert who testified at the October 3, 2012 hearing and whose opinion the ALJ afforded "more weight." (Doc. 19, at 8-9; *see also* R. 26). The ALJ wrote that she gave Dr. O'Brien's opinion more weight than Dr. Kurdikar's opinion because Dr. O'Brien "saw the entire record" and heard Plaintiff's testimony that she was "working at ACE as a cashier." (R. 26). But this does not explain what evidence in the record is inconsistent with Dr. Kurdikar's opinion or why Dr. Kurdikar's opinion lacks support. Dr. O'Brien

13

testified that Plaintiff's "psychiatrist indicate[d] that other than the mood symptomology, [Plaintiff is] functioning well in terms of her thought content process, in her ability to relate, and so on and so forth." (R. 60). But this Court cannot confirm that this was an analysis of Dr. Kurdikar's opinion or treatment records, or an analysis of the opinions of one of Plaintiff's other psychiatrists. This brief testimony by Dr. O'Brien does not provide a sufficient explanation for the ALJ to rely upon in disregarding Dr. Kurdikar's opinion.

Regarding the fact that Dr. Kurdikar did not hear Plaintiff's October 3, 2012 hearing testimony that she was "working at ACE as a cashier ([and] thus having public contact)," the ALJ implies that the testimony undermined the psychiatrist's assessment. (R. 26). But the ALJ did not discuss that Plaintiff explained that she only worked two days per week (nine to fifteen hours per week), and that she had only been working there six weeks but had already been sent home twice due to panic attacks. (R. 42-43; 48; 58). Nor did the ALJ explain why this testimony was inconsistent with Dr. Kurdikar's May 13, 2011 report.

For these reasons, the ALJ failed to adequately discuss Dr. Kurdikar's treatment of Plaintiff and explain why she rejected the psychiatrist's opinion, and this case must be remanded for the ALJ's further consideration of those issues.

**D.    RFC Assessment and VE Testimony**

Plaintiff also argues that the ALJ's RFC assessment fails to account for her seizures and postictal headaches, severe mental impairments, and her moderate difficulties with concentration, persistence and pace. (Doc. 12, at 13-14; Doc. 21, at 4). She further argues that the flawed RFC assessment resulted in questions to the VE that

failed to account for all of her impairments. (Doc. 12, at 14-15; Doc. 21, at 4-6). A claimant's RFC is the maximum she can do in a work setting despite her limitations. *Thomas*, 745 F.3d at 807 (citing 20 C.F.R. § 404.1545(a)). The RFC is based upon the medical evidence in the record, including the treating and examining doctors' opinions, as well as other evidence in the record, such as testimony from the claimant and the claimant's friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. §§ 404.1527(d), (f), § 404.1545(a)(3)). "When determining an individual's RFC, the ALJ must consider all limitations that arise from medically determinable impairments." *Thomas*, 745 F.3d at 807 (citing *Arnett*, 676 F.3d at 592; *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)).

Regarding Plaintiff's seizures and postictal headaches, the ALJ noted that the record contained multiple references to Plaintiff's headaches caused by seizures. (R. 23). However, the ALJ found that when Plaintiff is taking her medication, her condition is well-controlled; she does not have significant seizures for a three month period. (*Id.*). This finding appears to be based on Plaintiff's testimony at the October 3, 2012 hearing that: she was taking her medications for these conditions (Topamax and Trileptal) as prescribed; that she had not had a seizure since May 2012 as a result of taking her medication; that she could not remember the last time she had to visit the emergency room due to a seizure; and that her post-seizure headaches can be resolved "right away" if she can get medication.[4] (R. 47). The ALJ also stated that she considered and relied on the opinions of the state agency medical consultants who have evaluated this issue. (R. 23). The record contains a September 27, 2010 report by Dr. Young-Ja Kim,

---

[4] Plaintiff testified that she thought her medications were called Topamax and "Trepidol," but the record reveals she was taking Topamax and Trileptal. (R. 1487).

15

a DDS non-examining physician, who discussed that Plaintiff used Topamax to treat her headaches and seizures, and that although these conditions caused Plaintiff some limitations, her "emotional problems are her main limitation." (R. 972-74). Plaintiff cites to no medical opinions of any physicians or psychiatrists who found her seizures and postictal headaches cause her any limitations that the ALJ did not account for.

Plaintiff also testified at the previous hearing held before the ALJ on June 13, 2011 that her seizures had caused her to fall and sustain injuries, and also prevented her from being safe while driving. (R. 83; 85). In this regard, the ALJ's RFC determination included that Plaintiff's work environment must be exclusive of: concentrated exposure to work hazards such as unprotected heights and dangerous moving machinery; requirements for operating motor vehicles or moving machinery; and ladder, rope or scaffold climbing requirements. (R. 24-25). The ALJ also included these work environment limitations in her questions to the VE. (R. 68-70). Plaintiff does not explain what other limitations are required to account for her seizures and postictal headaches. She merely cites to instances in the record in which she had a seizure followed by a severe headache, and argues the ALJ failed to account for impairments caused by those issues. (Doc. 12, at 14). Contrary to Plaintiff's assertion, the ALJ reasonably accounted for Plaintiff's limitations caused by her seizures and postictal headaches in her RFC determination, and the ALJ's determination is supported by substantial evidence.

However, with regard to the limitations caused by Plaintiff's severe mental impairments, and her moderate difficulties with concentration, persistence and pace, Dr. Kurdikar opined on limitations caused by these conditions in her May 13, 2011 report.

(R. 1112-15). Since, as explained above, the ALJ needs to revisit Dr. Kurdikar's opinion, she should also revisit whether the mental RFC determination, and in turn the questions to the VE, reasonably accounted for all of Plaintiff's limitations caused by these conditions.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 11) is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: May 21, 2014

_____
SHEILA FINNEGAN
United States Magistrate Judge